ADEL HABBAS,

        Plaintiff,

-vs-

KINGS MOUNTAIN TRUCKING and
LAEEQ KHAN,

        Defendants.

**COMPLAINT**
(Jury Trial Demanded)

NOW COMES the Plaintiff, Adel Habbas, by and through undersigned counsel, alleges and complains against the Defendants, as follows:

## NATURE OF CASE

This case involves the failed purchase of a business venture by the Plaintiff from the Defendants, that including various misrepresentations, breaches of contract, false and misleading promises, false assertions and deception in the administration of commerce, between parties of two different states, for the attempted sale of a gas station business in Kings Mountain, North Carolina, that implicates a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") G.S. 75-1.1, *et seq.*

## PARTIES

1. Plaintiff, Mr. Adel Habbas, ("Habbas") is a citizen and resident of Raleigh, Wake County, North Carolina.

2. Defendant Kings Mountain Trucking ("Kings Mountain") is a business organized under the laws of one of the several states, with offices in, and conducting business in Gaston County, North Carolina.

3. Defendant, Mr. Laeeq Khan ("Khan"), is the owner of Kings Mountain and upon information and belief is a citizen and resident of Chambersburg, Pennsylvania: 3425 Carnoustie Drive, Chambersburg, PA 17202.

# JURISDICION

4. This Honorable Court has jurisdiction of this action and the parties thereto pursuant to Diversity of Citizenship in accordance with 22 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

# FIRST CLAIM FOR RELIEF

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("UDTPA") GS 75-1.1, *et seq.*

5. Defendants' truck stop was listed in Kings Mountain, North Carolina, for sale at one-hundred fifty thousand dollars ($150,000.) plus inventory/merchandise.

6. Various representations were made by the Defendants promising sales of one hundred twenty thousand dollars ($120,000.) per month and approximately sixty thousand dollars ($60,000.) in sales of gas. Defendants wanted Habbas to sell the gas and diesel; however, Defendants would keep the profits of the sale of the gas and diesel.

7. Habbas started negotiations with the Defendants. Habbas paid a deposit of ninety-five thousand dollars ($95,000.00) to the Defendants. Habbas had his funds wired to Defendants by checks, from a third party.

8. This is the base amount that Habbas is seeking to recover in this lawsuit, minus five-thousand dollars ($5,000.) that was repaid, prior to Defendants refusal to make further payments, thus costing Habbas ninety thousand ($90,000.) in lost money, plus associated expenses, and other damages.

9. Defendants made false promises and deceptions to lure Habbas into a business transaction, in order to purchase the Defendants' business. Defendants were promising something that was not there and listed something that was not there, in that the inside sales of the business were nowhere near the amount promised and represented by Defendants to Habbas.

10. Defendants made promises, assertions, and misrepresentations to Habbas that Defendants were working with a real estate agent and wanted to escape paying taxes. Defendants told Habbas not to contact the real estate agent, because he was paying him from his side.

11. Defendants requested that Habbas pay Defendants ninety-five thousand dollars ($95,000.00) towards the purchase of this business. Habbas paid ninety-five thousand dollars ($95,000.) and the Defendants returned five-thousand dollars ($5,000.), leaving ninety-thousand dollars ($90,000.) that Defendants have of Habbas' money.

12. Habbas refused to take over the store, after further investigation and discovery of Defendants' false promises and assertions of imaginary profits to lure Habbas into the purchase of the business. Defendants did not want Habbas to take over the store until the casino came into the area.

13. Upon information and belief, at the time of the attempted sale Defendants owned approximately one-hundred acres of land in the area.

14. A written lease was prepared. After Habbas tried a test-run at the store, it became apparent that there was no real money to made in the store from sales and that Defendants had made false and misleading assertions about the viability of the business. Upon information and belief, Defendants planned to take the payments from Habbas and then ultimately have him removed from the store.

15. Upon information and belief, previous "purchasers" of the store could not make the lease payments and were kicked-out by Defendants. This is a pattern and practice of Defendants.

16. Defendants promised Habbas two percent (2%) of proceeds from when the casino and hotels come into the area. Defendants said he would "look out" for Habbas and provide income to Habbas. This proved to be false, unfair, and deceptive misrepresentations about the business arrangement.

17. Defendants advised Habbas that they could split the proceeds from the gas station; that Defendants were going to tear it down and then they could split the profits; Defendants were going to tear down the gas station on his own expense. Defendants were going to return the ninety-five thousand dollars ($95,000.).

18. In actuality, Defendants store was too costly a business to run.

19. After this initial payment of fifty-thousand dollars ($50,000.) the realtor involved with the matter became disappeared, went out of the picture, and no longer was involved in the transaction at this point.

20. The numbers that Defendants provided to Habbas "did not add up" and appeared to be speculative; however, Habbas detrimentally relied on the representations of Defendants, because Habbas was interested in purchasing the business, to make a better life for his family, which includes a grandson who has a number of serious health conditions.

21. After making the initial payment of $50,000, Defendants wanted an additional payment of fourteen-thousand dollars ($14,000.00) for gas, etc. Relying on its misrepresentations, Habbas paid this amount to the Defendants.

22. Defendants represented to Habbas that store sales were approximately one hundred and twenty thousand ($120,000.00) per month. This proved to be extremely excessive, false, misleading, deceptive, and unfair. Habbas relied to his detriment on these assertions by the Defendants.

23. However, after further inspection and realization, Habbas discovered that the monthly sales only added up to about forty to fifty thousand dollars ($40,000.00 - $50,000.00) per month.

24. Defendants attempted to sale the business to Habbas without the gas sales. Defendants only wanted to offer Habbas the sales of the inside the store.

25. Upon information and belief, Defendants have a pattern and practice of "dragging people in," to business transactions to take financial advantage of them.

26. Defendants attempted to drag Plaintiff in with consignments. Ultimately, Defendants would take the "key" money - the money to purchase the store, and Plaintiff could not make the monthly payments. Once Plaintiff fell behind under this scheme, the Defendants would take back over the store.

27. While Plaintiff and his son were trying the store out, various workers warned Plaintiff that the Defendants had done this pattern and practice of deceiving would-be purchasers of the business.

28. Defendants ' actions of misrepresenting facts to Habbas about the business and demanding various payments toward this business venture, amounted to an unfair and deceptive trade practice under North Carolina law.

29. Habbas' grandson has various illnesses, including heart conditions, and was in and out of the hospital often.

30. Due to the misrepresentations of the Defendants, their course of dealing, and false promises, Plaintiff ultimately cancelled the agreement with the Defendants.

31. Defendants made various promises, affirmations, and other intentional misrepresentations directly to Habbas, that he would return all of Habbas' money.

32. Defendants unreasonable conditions on the return of Habbas' money, for example that it would be returned, "when the casino comes." "When the casino comes" was also promised to increase sales to $200,000.00 to $300,000.00 per month. Defendants claimed that McDonalds, Waffle House, and other businesses would come in and the sales would increase. Plaintiff asked the Defendants to put this on paper and in writing, but the Defendants would not do this.

33 Defendants were intentionally misleading, lying, deceptive, and misrepresented material facts to Habbas, about when the money would be returned, after Plaintiff cancelled the contract for purchase.

34. Plaintiff would call Defendants, and Defendants would not return the money as promised.

35. Defendant would not put it on paper in writing but said "not to worry;" "I promise you that I will give you a percentage, a cut from the property." Defendant was misrepresenting to Habbas about "making multi-million-dollar deals after the casino came in." Defendant claimed that he could rebuild the truck stop. Defendant assured Habbas that he would "make a lot of money" from the truck stop, up to $300,000.00 of sales from the inside of the store, then there is the diesel and the gas; that he would take care of Habbas' grandson and related illnesses.

36. Defendant said he really needed Habbas' money, that he has a mortgage, he cannot give it back. Defendant claimed that Plaintiff would make millions with him.

37. Defendant said he had already used the money paid by Habbas.

38. Defendant kept delaying business dealings due ostensibly to Covid-19, Defendant kept misleading Habbas, regarding the business, the real estate broker, and related matters.

39. Defendant told Habbas that they did not need a realtor to help with this transaction, so they could save money and move things along with less involvement from others. This was an intentional misrepresentation from Defendant because this made the ability to deceive and defraud Habbas easier, without a third-party realtor overseeing the sale of the business to Habbas.

40. Defendant continually delayed the consummation of the sale of the business, coming up with a number of excuses for delay. Defendants did the contract, Habbas was to try the location, and see if the numbers were there, with enough to live on. Habbas tried the business for a little over a week, it was three shifts per day, and he could barely cover workers expenses. The area was a "ghost town" and there was no real business there. The gas was priced too high, and it would not attract customers. Defendants claimed that he needed the profits from the gas. However, Defendants were not selling the gas profits to Habbas. This would come to him at some point; however, the store was not making money on the inside.

41. Defendants priced the gas too high. For example, the gas price of other truck stops was $3.00, and Defendants priced their gas at $3.49. Defendants were attempting to price gauge and take advantage of people. The bathrooms were not clean, the products in the store were out-of-date, and other related issues.

42. Habbas sold his business in Orlando, Florida. Habbas went into business with a businessperson in Georgia. This did not work out. Habbas then attempted to enter into this business deal with Defendants. Habbas had his previous business partner wire and forward Habbas' money to the Defendants for the downpayment on the business in question.

43. Habbas had to take a loan for $60,000.00 to help him get started again, after this business venture in question fell through, to help meet expenses, due to the delay and misrepresentations by Defendants.

44. Upon information and belief, Defendants have up to nine businesses and up to millions of dollars in his bank account and has the ability to repay Habbas.

45. Towards the end, Defendant would just slam the phone in Habbas' face; Defendant kept misleading Plaintiff, regarding the return of the money, with various excuses.

46. Habbas paid Defendant $95,000.00 towards the purchase of the business; Defendant returned $5,000.00 of this money, thus owing Habbas approximately $90,000.00.

47. The truck stop was located in and around Kings Mountain, North Carolina.

48. Defendant kept making false promises to Habbas about the ability to make money.

49. Defendant told Habbas that he would provide him with one-million dollars once the casino and the other business came in.

50. Defendant took Habbas' money with no intention of providing the truck stop or returning the money to Habbas. It was a total scheme to defraud Habbas out of his money.

51. In July 2022, Habbas again attempted to collect his money from Defendants.

52. Habbas sent text messages and had a telephone conversation with Defendant.

53. Defendant slammed the telephone down and refused to speak with Habbas.

54. Defendant now was no longer dragging Habbas along; he was outright refusing to pay Habbas his money back.

55. Habbas began to feel sick and upset, as now he knew that his $90,000.00 was not going to be paid back to him, without the help of the court system.

56. Defendants' unfair and deceptive actions and misrepresentation have directly and proximately caused the loss and conversion of Habbas' money.

57. Habbas has not heard from or had any communication from Defendant since on or about July 2022, regarding this matter.

58. Habbas is owed ninety-thousand dollars ($90,000.00) by the Defendants.

59. Habbas is out other consequential and related damages, directly and proximately caused by the Defendants' intentional misrepresentations and unfair and deceptive trade dealings.

60. Defendants intentionally, maliciously, willfully, and wantonly deceived, lied, mislead, misrepresented material facts, and conned Habbas out of his money, all to Habbas' loss, detriment, injury, damage, humiliation, and expense.

61. Habbas is seeking to have his money returned, with interest, as well as damages directly and proximately caused by the intentional and deceptive misrepresentations, unfair and deceptive trade practices, that are in or affecting commerce.

62. Habbas has suffered monetary damages, directly and proximately caused by the unfair and deceptive actions of the Defendants.

63. In violation of GS 75-1.1, both Defendants' actions and omissions regarding Habbas constitute, "unfair or deceptive act[s] or practice[s] or unfair method[s] of competition."

64. The actions and omissions outlined herein this Complaint, regarding the Defendants, are, "in or affecting commerce."

65. The actions and omissions of the Defendants outlined herein this Complaint, "proximately caused actual injury to the plaintiff [Habbas] or to his business".

66. Defendants' actions and omissions outline herein amount to engaging in conduct manifesting an inequitable assertion of power or position, including conduct which can be characterized as unethical.

67. Defendants' actions and omissions as outlined herein were committed or performed with such frequency as to indicate a general business practice.

68. Defendants have violated GS 58-63-15(11) and as such constitutes a violation of GS 75-1.1 as a matter of law, without the necessity of an additional showing of frequency indicating a general business practice.

69. Defendants' conduct is unfair and deceptive business practice because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers, including but not limited to Habbas.

70. As a direct and proximate result of Defendants' violations of the UDTPA, Habbas has suffered damages in excess of $75,000.00, are entitled to treble damages, costs of this action and a reasonable attorney's fee.

71. Habbas has been damaged by the actions of Defendants, proximately resulting in pecuniary loss, direct or indirect, damages for pain and suffering, mental, emotional distress, humiliation, discrimination, inconvenience, and damages or injury to reputation.

## PUNITIVE DAMAGES

72. The actions of Defendants exhibited aggravation related to the injuries inflicted upon Habbas, in that these actions show malice, willful and wanton conduct, all in violation of G.S. Section 1D-15, thus entitling Habbas to punitive damages. These actions were "participated in" directly by the Defendants, as outlined herein, and Defendants have condoned this conduct

Page 7 of 9

Case 3:24-cv-00997-KDB-DCK   Document 1   Filed 11/13/24   Page 7 of 10

constituting the aggravating factors, giving rise to punitive damages, thus Defendants are liable for punitive damages to the Plaintiffs.

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRCT

73. Habbas incorporated herein by reference, as if fully realleged and set forth herein, the allegations above in paragraphs 1 through 72.

74. Habbas and Defendant entered into a contract as outlined herein above in this Complaint, for valuable consideration, with an offer and acceptance of the contract, manifesting a meeting of the minds of and intent of the parties.

75. Defendant has failed and refused to complete his express and implied promises under said contract, proximately causing a material breach thereof, consequently proximately causing damages to Habbas.

76. Defendant is entitled to damages due from Defendants for its breach of contract, including but not limited to compensatory damages in the sum of $90,000.00.

## DEMAND FOR JURY TRIAL

Habbas, through undersigned counsel and pursuant to Federal Rule of Civil Procedure, Rule 38, hereby demands a jury trial for all issues involved in the above-entitled action.

## PRAYER FOR RELIEF

WHEREFORE, Habbas prays this Honorable Court for the following relief, jointly and severally, against all the Defendants, as follows:

1. For judgment against all the Defendants, in a sum of $90,000.00 in compensatory damages, as well as trebling the damages, including a reasonable attorney's fee and the costs of this action, as well as an additional sum as set by the trier of fact as punitive damages, for Habbas' First Claim for Relief of Violation of the North Carolina Unfair and Deceptive Trade Practices Act, GS 75-1.1 et seq.

2. For an award of Punitive Damages against the Defendant(s) due to the willful and wanton nature of their conduct and actions towards Habbas, as by law allowed, in an amount to be determined.

3. For judgment against all Defendants, in a sum of $90,000.00 in compensatory damages for Breach of Contract, as alleged in Habbas' Second Claim for Relief.

4. Ordering such other and further relief to Habbas, as this Honorable Court deems appropriate, equitable and just.

This the 10th day of June 2024.

*/s/ J. Elliott Field*
J. Elliott Field, Attorney-at-Law, PLLC
NCSB # 21679
216 N. McDowell St., Ste. 100
Charlotte, NC 28204
P (704) 334-3747
F (704) 334-3748
Email: *efieldjd@gmail.com*

*ATTORNEY FOR THE PLAINTIFF*

## VERIFICATION

Adel Habbas, Plaintiff in the above-entitled action, being duly deposed and sworn, states that he has read the *Complaint*, and that the allegations are true to his knowledge, and that allegations based upon information and belief, believes to be true.

This the 10th day of June 2024.

_____
ADEL HABBAS

SWORN TO and subscribed before me, this the 10th day of June 2024.

_____
NOTARY PUBLIC
My Commission Expires: 3-7-29

[Notary Seal: ZION B. CHISLEY, NOTARY PUBLIC, WAYNE COUNTY, NC]